

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

ENTERED
11/17/2017

| | | |
|---|---|---|
| In re: | § | |
| | § | Case No. 15-34425 |
| **VALERIY KOUKHTIEV,** | § | |
| | § | **Chapter 7** |
| Debtor. | § | |
| | § | |
| | § | |
| | § | |
| **HELLENE HINER,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Adversary No. 15-3338** |
| | § | |
| **VALERIY KOUKHTIEV,** | § | |
| | § | |
| **Defendant.** | § | |
| | § | |

## MEMORANDUM OPINION REGARDING PLAINTIFF'S FIRST AMENDED COMPLAINT TO DETERMINE DISCHARGEABILITY
### [This Order Relates to Adv. Doc. No. 15]

### I. INTRODUCTION

Hellene Hiner (the "Plaintiff") initiated the instant adversary proceeding against Valeriy Koukhtiev, the debtor in the main case (the "Debtor"), and requested this Court to declare that: (1) a certain judgment that she obtained against the Debtor in state court is a non-dischargeable obligation under 11 U.S.C. §§ 523(a)(2)(A) and/or (a)(6);[1] and (2) certain actions taken by the Debtor after the state court entered its judgment have caused injury to the Plaintiff and that the amount of these damages is also a non-dischargeable obligation.

---

[1] Any reference to any section (i.e., §) refers to a section in 11 U.S.C., which is the United States Bankruptcy Code, and any reference to "the Code" refers to the United States Bankruptcy Code unless otherwise noted. Further, any reference to "the Bankruptcy Rules" refers to the Federal Rules of Bankruptcy Procedure.

On February 16, 21, 22, and 23, 2017, this Court held a trial during which time the Plaintiff put on her case-in-chief. She called several witnesses and introduced numerous exhibits. She then rested. The Court then continued the trial to March 24, 2017 to afford the Debtor the opportunity to put on his case-in-chief.

On March 24, 2017, prior to beginning his case-in-chief, the Debtor, through his attorney of record, made an oral motion for directed judgment under Federal Rule 52(c).[2] On the same day, this Court issued an order granting in part and denying in part the Debtor's oral motion. [Adv. Doc. No. 52]. This order set forth that the motion was granted in part insofar as the Plaintiff, in her case-in-chief, had failed to meet her burden to prove that she has suffered damages arising out of any actions that the Debtor may have taken following the entry of the state court judgment. [*See* Pl's Ex. No. 1]. This order also set forth that the oral motion was denied in part insofar as the Debtor requested this Court to enter an order that the state court judgment is a dischargeable obligation. Finally, the order set forth that the trial would resume so that the Defendant could put on his case-in-chief.

On October 3, 2017, the trial resumed, and the Defendant put on his case-in-chief. After the Defendant adduced testimony and introduced exhibits, he rested. The Plaintiff chose to call no rebuttal witnesses. The Court then heard closing arguments, with the Plaintiff arguing that she had met her burden proving that the state court judgment is non-dischargeable under §§ 523(a)(2)(A) and/or (a)(6) and the Debtor arguing to the contrary. The Court then afforded the parties an opportunity to submit any authorities in support of their respective positions, and thereafter they each filed post-trial briefs. [Adv. Doc. Nos. 72 & 73].

The Court now issues the following Findings of Fact and Conclusions of Law pursuant to Bankruptcy Rule 7052. To the extent that any Finding of Fact is construed to be a Conclusion of

---

[2] Federal Rule 52(c) is applicable in this adversary proceeding pursuant to Bankruptcy Rule 7052.

Law, it is adopted as such; and to the extent that any Conclusion of Law is construed to be a Finding of Fact, it is adopted as such.  The Court reserves the right to make additional Findings and Conclusions as it deems appropriate or as any party may request.

## II. FINDINGS OF FACT

The relevant facts—as established by the pleadings and the evidence—are as follows:

1.  The Plaintiff obtained a master's degree in musicology at a music college in the Ukraine. [Tape Recording, Feb. 16, 2017 Hearing at 9:10:55–9:11:07 A.M.].  While in the Ukraine, the Plaintiff began developing a music teaching methodology to teach students how to learn music interactively with a computer.  [*Id.* at 9:11:42–9:11:50, 9:12:51–9:13:24 A.M.]. Upon arriving in the United States in 1993, the Plaintiff worked as a teacher's assistant in a Montessori school and taught music to students in a Ukrainian school.  [*Id.* at 9:11:17– 9:11:38 A.M.].  The Plaintiff moved to the United States in order to convert her "[music teaching] methodology to technology level."  [*Id.* at 9:11:52–9:11:58, 9:12:51–9:13:24 A.M.].

2.  The Debtor was born in Kazakhstan and received a master's degree in physics from the "Moscow Physical Technical Institute."  [Tape Recording, Feb. 21, 2017 Hearing at 3:26:40–3:27:02 P.M.].  He has no background or degree in music and no experience in education or teaching programs.  [*Id.* at 3:27:04–3:27:13 P.M.].

3.  In February of 2001, the Plaintiff first corresponded with the Debtor after meeting him through an online website; thereafter, the Plaintiff met the Debtor in person in New York. [Tape Recording, Feb. 16, 2017 Hearing at 9:17:04–9:17:52 A.M.]; [Tape Recording, Feb. 21, 2017 Hearing at 3:27:20–3:27:36 P.M.].  Towards the end of 2001, the Debtor moved into the Plaintiff's house in Houston.  [Tape Recording, Feb. 16, 2017 Hearing at 9:19:29–

9:19:36 A.M.]. They lived in the Plaintiff's house as "husband and wife" even though they were never officially married. [Tape Recording, Feb. 22, 2017 Hearing at 1:27:51–1:28:20 P.M.]. In fact, at this time, the Debtor was separated from his ex-wife (Tatyana Zadorskaya) and undergoing a divorce proceeding pending in a family law court in Massachusetts. [*See* Pl's Ex. No. 16]; [Adv. Doc. No. 44, p. 2 ¶ 2].

4. Eventually, the Plaintiff hired the Debtor to assist her in converting her music teaching methodology into a digitized computer program. [*See* Tape Recording, Feb. 16, 2017 Hearing at 9:20:33–9:21:17 A.M.]; [Pl's Ex. No. 2]. Specifically, she hired the Debtor "to do everything that was in connection with technology . . . [such as] software, computer games, website, and helping [her] with writing [a] patent application." [Tape Recording, Feb. 16, 2017 Hearing at 9:23:40–9:23:55 A.M.]. To memorialize the terms of the Plaintiff's hiring of the Debtor, the Plaintiff and the Debtor, on January 29, 2002, executed a "Work For Hire Agreement" between Cottage Music Academy, a sole proprietorship that the Plaintiff owned at that time, and the Debtor (the "Work Agreement"). [*Id.* at 9:21:08–9:21:50 A.M.]; [Pl's Ex. No. 2]. The Work Agreement, in pertinent part, set forth the following terms:

> **Work product ownership.** Valeri Koukhtiev waives any interest in the ownership of the work product, including but not limited to copyrightable works, ideas, discoveries, inventions, patents, products or other information, developed in whole or in part as a result of this agreement and such work product is the exclusive ownership of "[Cottage] Music Academy."
>
> **Confidentiality.** Valeri Koukhtiev will not at any time or in any matter, either directly or indirectly . . . divulge, disclose, or communicate in any manner any information that is proprietary to [Cottage] Music Academy. Valeri Koukhtiev will protect such information and treat it as strictly confidential. This provision shall continue to be effective after the termination of this Agreement. Upon termination of this Agreement, Valeri Koukhtiev will return to Cottage Music Academy all records,

4

> notes, documentation and other items that were used, created, or controlled by [Cottage] Music Academy during the term of this Agreement.

[Pl's Ex. No. 2].

5. Prior to the formal execution of the Work Agreement, in September of 2001, the Debtor was already assisting the Plaintiff by developing the "Soft Way to Mozart's" computer program (the "Soft Way Program"). [Tape Recording, Feb. 21, 2017 Hearing at 3:35:40–3:35:57 P.M.].

6. On March 10, 2003, the Plaintiff and the Debtor filed a provisional patent application with the U.S. Patent and Trademark Office, which named both of them as "inventors" (the "Patent Application"). [*Id.* at 3:28:34–3:28:49 P.M.]; [Pl's Ex. No. 6]. The Patent Application was signed by both the Plaintiff and the Defendant and was identified as application number 10/384,965. [Pl's Ex. No. 6, pp. 1 & 6]

7. Sometime at the end of 2002 or beginning of 2003, the Debtor and the Plaintiff began selling the Soft Way Program on compact discs for approximately $200.00 per disc either directly to the Plaintiff's students or through an online website that the Debtor had created. [Tape Recording, Feb. 21, 2017 Hearing at 3:37:49–3:37:15, 3:44:29–3:44:38, 3:45:07–3:45:16, 3:46:22–3:46:27 P.M.]; [Tape Recording, Oct. 3, 2017 Hearing at 2:27:41–2:28:26 P.M.]. The Plaintiff and the Debtor sold the Soft Way Program to customers in the United States, Russia, and other countries. [Tape Recording, Feb. 21, 2017 Hearing at 3:46:20–3:46:42 P.M.]. The Debtor deposited the proceeds of these sales into the Plaintiff's account. [*Id.* at 2:38:14–2:38:32 P.M.].

8. On May 25, 2005, the family law court in Massachusetts presiding over the Debtor's divorce proceeding entered a judgment of divorce that expressly required the Debtor and

his ex-wife to comply with the terms of the separation agreement that was incorporated in the judgment (the "Divorce Agreement"). [Pl's Ex. No. 16]. Attached to the Divorce Agreement is a "Financial Statement" that was signed by the Debtor under the penalty of perjury. [*Id.* at p. 4]. In the Financial Statement, the Debtor represented to the family law court that the value of all his assets totaled $2,500.00, which comprised only the fair market value of certain real estate property. [*Id.* at p. 7]. In the section entitled "Other (such as – stocks, bonds, collections)", the Debtor did not list any "other" assets that he owned at that time. [*Id.*]; [Tape Recording, Feb. 21, 2017 Hearing at 3:31:00–3:31:35 P.M.]. Further, in the Financial Statement, the Debtor did not list any interests—existing or prospective—that he had in any trademarks, patents, or patent applications associated with the Soft Way Program. [Tape Recording, Feb. 21, 2017 Hearing at 3:31:39–3:32:00 P.M.]. Nor did he list the Soft Way Program on the Financial Statement. [Pl's Ex. No. 16]. The Debtor made these representations under oath to the family law court after: (1) he (and the Plaintiff) had already commenced selling the Soft Way Program for $200.00 per disc, [Finding of Fact No. 7], and (b) he, together with the Plaintiff, had already filed the Patent Application, [Finding of Fact No. 6]. Thus, the Debtor represented to the family law court that he had no interests whatsoever in any patents, patent applications, trademarks, or software programs.

9. On July 12, 2005, the U.S. Patent and Trademark Office issued a trademark for the Soft Way Program, which is identified as Trademark Registration 2,967,051. [Pl's Ex. No. 5].

10. On September 13, 2009, the Plaintiff vacated her house in Houston and moved to New York. [Tape Recording, Feb. 16, 2017 Hearing at 9:52:28–9:52:39, 10:12:33–10:12:41 A.M.]; [Tape Recording, Feb. 21, 2017 Hearing at 2:37:54–2:38:01, 3:41:17–3:41:24

P.M.]. The Plaintiff moved to New York because her personal relationship with the Debtor had become very contentious. [*See* Tape Recording, Feb. 16, 2017 Hearing at 10:12:34–10:13:15 A.M.]. During the time the Plaintiff was living in New York, the Debtor remained as the sole tenant in the Plaintiff's house. [Tape Recording, Feb. 21, 2017 Hearing at 3:42:29–3:43:19 P.M.].

11. On December 8, 2009, the U.S. Patent and Trademark Office awarded the Patent Application (the "<u>Patent</u>"). [Pl's Ex. No. 6, p. 1]; [Tape Recording, Feb. 16, 2017 Hearing at 9:26:34–9:26:38, 9:45:14–9:45:53 A.M.].

12. In November 2010, the Plaintiff, together with her new husband, returned to Houston and moved back into her house. [Tape Recording, Feb. 16, 2017 Hearing at 10:15:15–10:15:52 A.M.]. In February of 2011, the Debtor moved out of the Plaintiff's house. [Tape Recording, Feb. 21, 2017 Hearing at 2:03:00–2:03:07, 3:43:18–3:43:24 P.M.]. When the Debtor moved out of the house, he left certain items at this residence, including the computer that stored both the Soft Way Program and the source code for this program.[3] [*Id.* at 2:06:18–2:06:43 P.M.]. However, despite the Plaintiff's many requests, the Debtor refused to provide the source code associated with the Soft Way Program to the Plaintiff. [*Id.* at 2:04:24–2:04:54 P.M.]; [Tape Recording, Feb. 16, 2017 Hearing at 10:09:40–10:09:57 A.M.]. According to the Plaintiff, in order to sell the Soft Way Program, one must have access to the source code to make changes or updates to the Soft Way Program. [Tape Recording, Feb. 16, 2017 Hearing at 9:53:30–9:53:53 P.M.]; [Tape Recording, Feb. 21, 2017 Hearing at 2:04:09–2:04:24 P.M.]. Specifically, the source code is used to

---

[3] Merriam-Webster defines "source code" as a "computer program in its original programming language [] before translation into object code usually by a compiler." *Source Code Definition*, MERRIAM-WEBSTER.COM, https://www.merriam-webster.com/dictionary/source%20code (last visited Nov. 17, 2017). Further, the Plaintiff describes the "source code" as "the source of production." [Tape Recording, Feb. 16, 2017 Hearing at 9:53:30–9:53:40 A.M.].

"compile a program into binary format to be run on the computer." [Tape Recording, Feb. 21, 2017 Hearing at 3:40:39–3:40:50 P.M.].

13. On March 7, 2011, the Plaintiff initiated a lawsuit against the Debtor in the 270th Judicial District in Harris County, Texas (Cause Number 2011-13952) to protect her intellectual property from the Debtor and to enforce the Work Agreement (the "State Court Lawsuit"). [*Id.* at 2:05:00–2:05:19, 3:48:14–3:48:21 P.M.]; [*see* Pl's Ex. No. 1, p. 2]. After the Plaintiff initiated the State Court Lawsuit, the Debtor still refused to give her the source code for the Soft Way Program and refused to assist her in gaining access to the Soft Way Program. [Tape Recording, Feb. 21, 2017 Hearing at 2:05:30–2:05:58 P.M.].

14. As a result, in 2011, after the Plaintiff was unable to access the source code for the Soft Way Program that the Debtor had created, the Plaintiff hired a team of professional programmers to help her retrieve the source code and to "create [an] executable file with new protection." [*Id.* at 2:05:47–2:06:13 P.M.].

15. In 2012, the Debtor, unbeknownst to the Plaintiff, sold several copies of the Soft Way Program under an assumed name, or *dba*, called "Bummel Software" for "around $300.00" per disc. [*Id.* at 3:48:36–3:49:01, 3:50:04–3:50:13 P.M.]. The Debtor did not remit to the Plaintiff any of the proceeds he received from the sales of the program made under his *dba*, but rather kept all of these proceeds himself. [*Id.* at 3:50:50–3:50:57 P.M.]. Indeed, the Plaintiff had absolutely no knowledge of Bummel Software's existence. [*Id.* at 2:01:57–2:02:13 P.M.].

16. Also, sometime in 2012, the Debtor created an account on the Amazon.com website in order to sell the Soft Way Program under Bummel Software to online customers. [*Id.* at 4:01:18–4:01:29 P.M.]; [*see* Pl's Ex. No. 29, p. 2].

17. The state court held a jury trial in the State Court Lawsuit on January 14, 15, 16, and 17, 2013. [Tape Recording, Feb. 21, 2017 Hearing at 3:48:21–3:48:29 P.M.]; [Pl's Ex. No. 1, p. 1]. It was only in the State Court Lawsuit that the Plaintiff learned, through the Debtor's testimony, that he had sold several copies of the Soft Way Program under his *dba*, i.e., Bummel Software. [Tape Recording, Feb. 21, 2017 Hearing at 3:50:20–3:50:50 P.M.].

18. On February 25, 2013, the state court, based upon the jury's findings, issued a judgment in favor of the Plaintiff (the "Judgment"). [Pl's Ex. No.1]. Specifically, as set forth in the Judgment, the state court found, among other things, that: (a) the Work Agreement is a binding agreement; (b) pursuant to the Work Agreement, the Debtor agreed to assign any and all of his interest in the ownership of his work product—including copyrightable works, ideas, discoveries, programming code, software, inventions, trademarked and patents—to the Plaintiff; (c) the Plaintiff solely and exclusively owns certain property, including, but not limited to, the Soft Way Program and the Patent; and (d) the Debtor does not have any right, title, or ownership interest in such property. [*Id.* at p. 3].

19. Also, as set forth in the Judgment, the state court awarded the Plaintiff the following amounts: (a) $1,400.00, representing the profits the Debtor received in wrongfully selling the Soft Way Program solely owned by the Plaintiff; (b) $16,857.90, representing the reasonable and necessary costs incurred by the Plaintiff to develop replacement software for the Soft Way Program after the Debtor refused to provide the source code to the Plaintiff; (c) $46,650.00, representing the amount that the Plaintiff incurred for reasonable and necessary attorney's fees for the prosecution of the State Court Lawsuit; (d) $15,000.00, representing the fees awarded if the Plaintiff is successful in defending against

the Debtor's appeal to the court of appeals;[4] (e) pre-judgment interest on the actual damages and attorney's fees at 5.0% per annum; and (f) post-judgment interest at 5.0% per annum. [*Id.* at p. 2].

20. Further, as set forth in the Judgment, the state court enjoined the Debtor from: (a) selling, distributing, or offering the sale of the Soft Way Program; (b) engaging in any activity or sale of any aspect of the Patent associated with the Soft Way Program; and (c) advertising or using any of the protected sign, design, or expression which are covered under the trademark associated with the Soft Way Program. [*Id.* at p. 4].

21. After the state court issued the Judgment, the Debtor appealed to the court of appeals. [Tape Recording, Feb. 21, 2017 Hearing at 4:47:16–4:47:27 P.M.]. The Debtor did not prevail in his appeal. [*See id.*].

22. Meanwhile, even though the Judgment declared the Plaintiff the sole and exclusive owner of the Soft Way Program, the Debtor continued to operate his Bummel Software account on Amazon.com for several months after the issuance of the Judgment because—to quote the Debtor's disingenuous explanation—"there was no judgment that [he] had to close [his] Amazon account." [*Id.* at 4:01:40–4:02:35 P.M.]. It was only at some point in 2014 or 2015 that the Debtor closed Bummel Software's Amazon account. [*Id.* at 4:01:36–4:02:12 P.M.].

23. On August 21, 2015, the Debtor filed a Chapter 7 petition initiating the main case. [Main Case No. 15-34425, Doc. No. 1].

---

[4] The Judgment also awards an additional $15,000.00, which represents the fees awarded if the Plaintiff is successful in defending against an appeal by the Debtor to the Texas Supreme Court. [Pl's Ex. No. 1, p. 2]. However, the Debtor, who did appeal to the court of appeals (and lost), [Tape Recording, Feb. 21, 2017 Hearing at 4:47:16–4:47:27 P.M.], never appealed to the Texas Supreme Court; therefore, this particular $15,000.00 is not part of the principal balance now owed under the Judgment.

24. On December 31, 2015, the Plaintiff filed her original complaint initiating the instant adversary proceeding, [Adv. Doc. No. 1]; and on April 14, 2016, she filed her first amended complaint, which is the "live" pleading (the "Complaint"), [Adv. Doc. No. 15]. While the Plaintiff requested an award for reasonable attorney's fees in the Complaint for prosecuting this adversary proceeding, she did not specifically request any pre- or post-judgment interest. [*Id.* at pp. 6–7 of 7].

25. On October 10, 2016, the Debtor filed his answer to the Complaint. [Adv. Doc. No. 23].

26. On February 11, 2017, the Plaintiff submitted her pretrial statement, and in this statement, she did not request either attorney's fees for the prosecution of this adversary proceeding or pre- or post-judgment interest. [Adv. Doc. No. 36].

27. On February 14, 2017, the Debtor submitted his pretrial statement. [Adv. Doc. No. 44].

28. The Court then held a multi-day hearing on the Complaint on February 16, 21, 22, 23, March 24, and October 3, 2017.

### III. CREDIBILITY OF THE WITNESSES

Three witnesses testified during the multi-day trial: (1) the Plaintiff; (2) the Debtor; and (3) Katya Kuznetsova.

1.  The Plaintiff

The Plaintiff, for the most part, was a credible witness. The Court notes that, while in the witness box, the Plaintiff displayed signs of intense dislike and animosity towards the Debtor. The Court finds that the Plaintiff's resentment towards the Debtor understandable, as they had undergone the jury trial in state court over the Soft Way Program and the intellectual property associated therewith; additionally, they did have, at one time, an intimate, personal relationship that clearly soured into a bitter, acrimonious dispute and animosity for one another.

Not only did the Plaintiff appear emotionally distraught at times, but she also exaggerated the extent of the Debtor's "taking" of proceeds from the sales of the Soft Way Program in 2002/2003. [*See* Finding of Fact No. 7]. With respect to the proceeds generated from sales in 2002/2003, the Plaintiff initially asserted that the Debtor "completely ripped [her] off of all [her] funds." [Tape Recording, Feb. 21, 2017 Hearing at 2:37:50–2:38:56 P.M.]. However, subsequently, when asked whether the proceeds obtained in 2002/2003 were deposited into her bank account, she responded in the affirmative and stated that it was "nice that [the Debtor] did [deposit the money into her bank account]." [*Id.* at 2:38:06–2:38:31 P.M.].[5]

The Plaintiff also appeared to downplay the financial assistance given by the Debtor with respect to the maintenance of her house in Houston. For instance, when asked whether the Debtor paid the homeowner's association fee on her house on December 15, 2009, the Plaintiff responded that "yes, [the Debtor] did most likely [pay] because [she] didn't have any money [in her] account" and that "it was nice [when the Debtor paid $460.00 to the homeowner's association]." [*Id.* at 2:30:11–2:30:39 P.M.]. Indeed, not only was her response an understatement, but this testimony was in direct contradiction of her prior testimony that "[the Debtor] didn't contribute anything [to the house]." [Tape Recording, Feb. 16, 2017 Hearing at 9:52:47–9:52:55 A.M.].

Although it is obvious that the Plaintiff's testimony was initially off the mark on the two issues discussed above, the Court attributes this inaccuracy to the Debtor's emotional state on the witness stand. She was clearly distraught, tearful, and uncomfortable at times due to the

---

[5] It is important to distinguish between the sales of the discs by the Debtor and the Plaintiff in 2002/2003 at $200.00 per disc, [Finding of Fact No. 7]—the proceeds of which the Debtor deposited into the Plaintiff's account—and the Debtor's surreptitious sales of the discs in 2012 under his *dba* at $300.00 per disc, [Finding of Fact No. 15], the proceeds of which he concealed from the Plaintiff and kept for himself. Stated differently, with respect to the Debtor's sales of the discs in 2012, and his pocketing all of the sales proceeds, there is no question that the Debtor—to use the Plaintiff's phrase—"completely ripped [her] off of all [her] funds."

tempestuous relationship that she had had with the Debtor. Other than her failure to accurately testify regarding these two points, the Court finds that the Plaintiff was forthright, accurate, and direct in her testimony regarding the other material issues raised at trial. Specifically, the Plaintiff credibly testified about the background of her relationship with the Debtor, including how she met him as well as the time frame of when he moved in and out of her house. She also credibly testified about how she developed her music teaching methodology, which subsequently resulted in her seeking assistance from the Debtor to build the Soft Way Program. The Court also finds the Plaintiff credible regarding her testimony that the Debtor refused to give her the source code to the Soft Way Program, that she had no knowledge that the Debtor had set up his own *dba* (i.e., Bummel Software), and that she was unaware that he was using his *dba* to sell the Soft Way Program at $300.00 per disc. [Finding of Fact Nos. 12, 13, 15, & 16]. Indeed, the Plaintiff also credibly testified that because the Debtor refused to give her the source code, she had to retain a team of professional programmers to retrieve the source code and to create an executable file. [Finding of Fact No. 14].

In sum, while the Plaintiff's testimony was off the mark on two issues, the Court finds that with respect to the remainder of her testimony, she was very credible and therefore gives substantial weight to her testimony.

2. The Debtor

The Debtor was a somewhat credible witness. The Court finds that the Debtor credibly testified about his background and his role in developing and selling the Soft Way Program. Indeed, he credibly testified that he (together with the Plaintiff) first sold the Soft Way Program for approximately $200.00 per disc, and later (without informing the Plaintiff) sold the program under his personal *dba* (i.e., Bummel Software) for approximately $300.00 per disc. [Finding of

Fact Nos. 7 & 15]. He also credibly testified that he did not share with the Plaintiff any of the proceeds from his *dba*'s sale of the Soft Way Program. [Finding of Fact No. 15]. The Court notes, however, that he did not really have an option to obfuscate on these points, as these facts had already been revealed in the State Court Lawsuit.

The most obvious inconsistency in the Debtor's testimony concerns his assertion that he owns an interest in the Soft Way Program. Specifically, he testified that he has an interest in the Patent (which is associated with the Soft Way Program) because he was listed as one of the "inventors", [*see* Finding of Fact No. 6]; yet, he also testified that he did not list the Soft Way Program or the Patent Application in the Financial Statement attached to the Divorce Agreement as assets in which he has always (or, even, prospectively) owned an interest. [Finding of Fact No. 8]. In fact, the Financial Statement—which the Debtor signed under penalty of perjury— clearly shows that he listed only certain real estate as his claimed assets. [*Id.*]. Under these circumstances, the Court finds it is highly questionable for the Debtor to now claim that he has all along had an ownership interest in the Patent and the Soft Way Program and that his actions towards the Plaintiff were based upon this belief. His failure to disclose these interests (existing or prospective) in 2005 in his divorce proceeding and his testimony in this adversary proceeding that he has always had an interest in these assets underscore his poor credibility.[6]

Also, the Debtor acknowledged that certain email messages were sent from his personal email account; however, the Debtor insists that because he "[didn't] remember sending [the

---

[6] In his brief, the Debtor asserts that he did not disclose an ownership interest in the Patent in his divorce proceeding because the Patent was not issued until 2009. [Adv. Doc. No. 72, p. 5 of 10]. The Court finds the Debtor's excuse ineffective. A patent application is unquestionably an "asset" that the Debtor should have been disclosed as part of his assets in the Financial Statement that he signed under oath in his divorce proceeding. *See, e.g., In re Surfango, Inc.*, No. 09-30972 (RTL), 2009 WL 5184221, at *9 (Bankr. D.N.J. Dec. 18, 2009) (stating that assets include "patent applications and other intellectual property"); *Holt v. United States*, 1973 U.S. Dist. LEXIS 12174, at *2 (D.C. Aug. 23, 1973) ("The intangible assets comprised patent applications filed and in process and papers relating to engineering and programming documentation."); *Mitchell Camera Corp.*, T.C.M. (P-H) P 47172, 1947 WL 8088 (T.C. 1947) ("Included in the assets acquired from Mitchell of California were some 30 patents and patent applications upon which patents were later issued.").

email, then] probably [he] didn't send it." [Tape Recording, Feb. 22, 2017 Hearing at 1:17:15–
1:18:12 P.M.]. Stated differently, the Debtor suggests that because he did not "remember"
sending an email from his own personal email account, it necessarily means he never sent such
email. The Court finds this testimony suspect, especially in light of the fact that he
acknowledged that the email was sent from his own email account and that the email was signed
"Respectfully, Valeri." [*Id.*]. Indeed, the Debtor testified that no other person besides him sends
emails from his personal email account. [Tape Recording, Feb. 23, 2017 Hearing at 1:02:55–
1:03:00 P.M.].

Further, when asked whether the Plaintiff was the sole creator of the music teaching
methodology, the Debtor disagreed. [Tape Recording, Oct. 3, 2017 Hearing at 3:23:07–3:23:23
P.M.]. Thus, although the Debtor acknowledged that he has no music background, [Finding of
Fact No. 2], he suggests that he also had a part in creating the music teaching methodology and
not just in the development of the digitized Soft Way Program, [*see* Finding of Fact No. 4].
Having no music background whatsoever, the Debtor's suggestion that he was a co-creator of the
music teaching methodology makes very little sense, and casts a pall on his credibility.

Finally, the Debtor displayed some hesitancy and non-responsiveness when questioned
about the Amazon account that he created and maintained. For example, at one point, counsel
for the Plaintiff asked the Debtor whether he created a particular Amazon page to sell the Soft
Way Program. While he recognized the picture on the Amazon page as the Soft Way Program
product box, he denied creating the Amazon page and insisted that the "Amazon company
[created] Amazon site." [Tape Recording, Feb. 21, 2017 Hearing at 3:59:46–4:00:57 P.M.].
However, minutes later, when asked again whether he set up an Amazon account for Bummel
Software to sell the Soft Way Program, he admitted: "Uh yes, I set up the account on Amazon to

sell [the Soft Way Program], yes." [*Id.* at 4:00:44–4:01:29 P.M.]. His contradictory answer on whether he set up the Amazon account calls into question his credibility.

In sum, while the Debtor was credible on some issues, he was not credible on various issues that are material in this adversary proceeding. Thus, this Court finds the Debtor to be credible only on certain issues and gives his testimony some—but not substantial—weight.

3. Katya Kuznetsova

Katya Kuznetsova ("Ms. Kuznetsova") was born in Moscow and moved to the United States in 1995. [Tape Recording, Feb. 22, 2017 Hearing at 2:11:28–2:11:37 P.M.]. She credibly testified about her family (including her marriage and children) and her role as author of an online live journal.

At certain times during the trial, Ms. Kuznetsova's answers were non-responsive, flippant, or evasive. For example, when asked whether she remembered receiving an order from this Court to appear at a deposition (which she clearly attended), she responded with: "I don't know what you're talking about, but whatever." [*Id.* at 2:12:56–2:13:18 P.M.]. Further, counsel for the Plaintiff asked Ms. Kuznetsova about her intentions behind a letter that she had sent to the jurist who presided over the State Court Lawsuit, Judge Brent Gamble. [*Id.* at 2:19:41–2:19:49 P.M.]; [*see* Pl's Ex. No. 33]. Rather than testifying about her motives in sending the letter, she responded with: "I think the letter explains why I sent it." [Tape Recording, Feb. 22, 2017 Hearing at 2:19:49–2:19:54 P.M.].

Additionally, while the Court finds Ms. Kuznetsova credible regarding her testimony about how she first met the Debtor, [*id.* at 12:52:19–12:52:38 P.M.], the Court finds highly suspect her testimony that she considers him only as an "acquaintance," [*id.* at 2:11:42–2:12:06 P.M.]; [Tape Recording, Feb. 23, 2017 Hearing at 12:55:40–12:55:47 P.M.], and that she only

"knows that [the Debtor] exists," [Tape Recording, Feb. 23, 2017 Hearing at 12:52:40–12:52:53 P.M.]. The Court finds her testimony questionable because in the letter that she sent to Judge Gamble, she represents the Debtor to be "a friend of mine [i.e., Ms. Kuznetsova], the most decent, kind and brilliant person." [Pl's Ex. No. 33]. Indeed, it is unlikely that one would attend a state court trial which involves a mere acquaintance, lend money to this acquaintance, and also send a letter to the state court judge criticizing the judge for mistreating this acquaintance.[7] [*See id.*]; [Tape Recording, Feb. 23, 2017 Hearing at 12:55:50–12:56:04 P.M.]. Further, the Court finds suspect that although Ms. Kuznetsova acknowledges that certain online comments were made on a third party's blog under her "Katyak" website account, [*see* Pl's Ex. No. 39], she was unable to recall whether she made any of those comment entries, [Tape Recording, Feb. 22, 2017 Hearing at 2:34:07–2:39:15 P.M.]. Indeed, Ms. Kuznetsova could not recall making *any* comments on this third party's blog even though several comments were made under her "Katyak" website account. [*Id.* at 2:35:20–2:35:30, 2:39:00–2:39:15 P.M.].

Overall, due to her failure to remember specific information, her palpable bias in favor of the Debtor, her intense dislike of the Plaintiff, and the fact that Ms. Kuznetsova's testimony does not bear significance on any important points so as to assist this Court in determining whether the Judgment should be non-dischargeable, the Court gives no weight to her testimony.

## IV. CONCLUSIONS OF LAW

### A. Jurisdiction, Venue, and Constitutional Authority to Enter a Final Order

1. Jurisdiction

This Court has subject matter jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b) and 157(a). Section 1334(b) provides that "the district courts shall have

---

[7] In this letter, Ms. Kuznetsova stated, among other things, that "[she] saw how a friend of [hers], the most decent, kind and brilliant person, was humiliated and accused publicly in deeds that he did not do without any evidence or proof and you [i.e., Judge Gamble] did not stop it." [Pl's Ex. No. 33].

original but not exclusive jurisdiction of all civil proceedings arising under title 11 [the Code], or arising in or related to cases under title 11." District courts may, in turn, refer these proceedings to the bankruptcy judges for that district. 28 U.S.C. § 157(a). In the Southern District of Texas, General Order 2012-6 (entitled General Order of Reference) automatically refers all eligible cases and proceedings to the bankruptcy courts.

This suit is a core proceeding because it is a suit to determine the dischargeability of a specific debt pursuant to 28 U.S.C. § 157(b)(2)(I), and this suit is also core under the general "catch-all" language because such a suit is the type of proceeding that can only arise in the context of a bankruptcy case. *See In re Southmark Corp.*, 163 F.3d 925, 930 (5th Cir. 1999) ("[A] proceeding is core under § 157 if it invokes a substantive right provided by title 11 or if it is a proceeding that, by its nature, could arise only in the context of a bankruptcy case."). Preventing the discharge of a specific debt—here, the Judgment—can only occur in a bankruptcy court. There is no state law equivalent of this action.

2. Venue

Venue is proper pursuant to 28 U.S.C. § 1409(a).

3. Constitutional Authority to Enter a Final Order

The Supreme Court's decision in *Stern v. Marshall* recognized certain limitations on bankruptcy courts' authority to enter final orders. 564 U.S. 462 (2011). Therefore, this Court has a duty to question its constitutional authority to enter a final order for any matter brought before it. The Court concludes that the facts in the pending suit are distinguishable from those in *Stern*, and that this Court has the authority to enter a final order.

In *Stern*, the debtor filed a counterclaim based solely on state law, and the resolution of this counterclaim did not resolve the validity, or invalidity, of the claim held by the defendant.

*Id.* Here, the matter before the Court is not a counterclaim by the Debtor or the estate brought pursuant to state law, but rather is an adversary proceeding brought by a judgment creditor (i.e., the Plaintiff) against the Debtor to determine the non-dischargeability of a specific debt (i.e., the Judgment) pursuant to § 523(a)—an express provision of the Code. "Determining the scope of the debtor's discharge is a fundamental part of the bankruptcy process[,]" and was unchanged by the decision in *Stern*. *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011). Therefore, this Court has the constitutional authority to enter a final order in this adversary proceeding.

Finally, in the alternative, this Court has the constitutional authority to enter a final order on the Complaint because the Plaintiff and the Debtor have consented, impliedly if not explicitly, to adjudication of this dispute by this Court. *Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1947 (2015) ("Sharif contends that to the extent litigants may validly consent to adjudication by a bankruptcy court, such consent must be expressed. We disagree. Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be expressed. Nor does the relevant statute, 28 U.S.C. § 157, mandate express consent. . . ."). Indeed, the Plaintiff filed a pretrial statement and explicitly stated that "she consents to entry of final orders by this Court." [Adv. Doc. No. 36, p. 5 of 7]. A few days later, the Debtor filed his own pretrial statement and set forth that: "Defendant [i.e., the Debtor] responded [to the Complaint] that he 'admits the allegations' but does not specifically state that he consents to final orders by this Court." [Adv. Doc. No. 44, p. 6 of 7]. Stated differently, the Debtor never expressly objected to this Court entering a final order in his pretrial statement. Moreover, the Debtor participated in a multi-day trial in this Court, and not once did he ever object to this Court's constitutional

authority to enter a final order.   If these circumstances do not constitute consent—at least implied, if not expressed—then nothing does.

**B.  Burden of Proof to Demonstrate Non-Dischargeability Under § 523(a) of the Code**

In an adversary proceeding to determine the dischargeability of a debt, the plaintiff bears the burden of proving the elements by a preponderance of the evidence.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991); *Tower Credit, Inc. v. Gauthier*, 349 F. App'x 943, 945 (5th Cir. 2009); Fed. R. Bankr. P. 4005.  "Intertwined with this burden is the basic principle of bankruptcy that exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the Debtor may be afforded a fresh start."  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).  However, the Code affords relief only to the "honest but unfortunate debtor," and an individual may not obtain a discharge of debts incurred through his own wrongful conduct.  *Grogan*, 498 U.S. at 286; *In re Borschow*, 467 B.R. 410, 417 (Bankr. W.D. Tex. 2012).

**C.  The Plaintiff has met her Burden of Demonstrating Willful and Malicious Injury Pursuant to § 523(a)(6) of the Code, and Therefore the Judgment is Non-Dischargeable Under this Particular Provision**

In the first instance, the Plaintiff asserts that the Judgment is non-dischargeable under § 523(a)(6) because the actions of the Debtor that resulted in the Judgment constitute willful and malicious injury to the Plaintiff's property—i.e., her business, which includes her patent and trademark rights, the Soft Way Program, and the source code associated with the Soft Way Program.  The Court now addresses this claim.

The Supreme Court has established guidelines for determining whether a debt arises from "willful and malicious injury" under § 523(a)(6).  *Kawaauhau v. Geiger*, 523 U.S. 57, 59 (1998). In *Kawaauhau*, the Court held that § 523(a)(6) does not except from discharge debts arising from

negligently inflicted injury. *Id.* Rather, it applies only to "acts done with the actual intent to cause injury," and excludes intentional acts that merely happen to cause injury. *Id.* at 61. "Willful," as used in the provision, "modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury,* not merely . . . a deliberate or intentional *act* that leads to injury." *Id.* The Supreme Court also noted that the language of § 523(a)(6) mirrors the definition of an intentional tort, which requires that an actor "intend '*the consequences of an act,*' not simply '*the act itself.*'" *Id.* at 61–62. Further, as to the "malicious injury" requirement of § 523(a)(6), the Fifth Circuit has held that the word "malicious" creates an "implied malice standard." *Miller v. J.D. Abrams, Inc.* (*In re Miller*), 156 F.3d 598, 605 (5th Cir. 1998). A debtor acts with implied malice when he acts "with the actual intent to cause injury." *Id.* at 606. The test for willful and malicious injury under § 523(a)(6), therefore, is condensed into a single inquiry of whether there exists "either an objective substantial certainty of harm or a subjective motive to cause harm" on the part of the debtor. *Id.*; *In re Williams*, 337 F.3d 504, 508–09 (5th Cir. 2003).

Finally, injuries covered under this section "are not confined to physical damage or destruction; an injury to intangible personal property or property rights is sufficient." 4-523 *Collier on Bankruptcy* ¶ 523.12[4]. "Thus, the conversion of another's property [or interest in property] without the owner's knowledge or consent, done intentionally and without justification and excuse, is a willful and malicious injury within the meaning of the exception." *Id.* For example, "in the context where a debtor has converted a creditor's collateral, it has been held . . . that the 'willful' requirement of § 523(a)(6) may be indirectly established by the creditor demonstrating the existence of two facts: (1) the debtor knew of the creditor's lien rights; and (2)

the debtor knew that his conduct would cause injury to those rights." *In re Jones*, 276 B.R. 797, 802 (Bankr. N.D. Ohio 2001).

    1.  Application of the Law to the Facts in the Instant Dispute

      The Court's analysis begins by noting that it does not need to determine the amount of the debt at issue. The amount of the debt has already been determined, and it is set forth in the Judgment. [*See* Finding of Fact No. 19]. The question is whether the Debtor's acts that resulted in the Judgment come within the type of conduct described in § 523(a)(6) such that the debt evidenced by the Judgment is non-dischargeable.

      The Court finds that the Debtor's acts were done with the actual intent to cause injury to the Plaintiff's property (i.e., her business). Specifically, the Plaintiff credibly testified that in order for her to sell and distribute the Soft Way Program to various purchasers, she needed the source code to access, update, and sell the software. [Finding of Fact No. 12]. She also credibly testified that the Debtor refused to provide her the source code to access, update, and sell the Soft Way Program. [*Id.*]. The Debtor did not effectively rebut this testimony. Rather, when counsel for the Plaintiff asked the Debtor *when* exactly he allegedly gave the source code to the Plaintiff, he responded with: "Source code was available for [the Plaintiff] all the time. We lived together." [Tape Recording, Feb. 22, 2017 Hearing at 1:13:12–1:13:31 P.M.]. Stated differently, the Debtor essentially contends that because the computer was physically located in the Plaintiff's house, then that necessarily means that the Plaintiff had access to the source code for the Soft Way Program. The Court is not persuaded by the Debtor's argument.

      First, had the Plaintiff been able to access the Soft Way Program through the source code, she would have never had to hire and pay a team of professional programmers to retrieve the source code and create a new executable file. [Finding of Fact No. 14]. Second, the Plaintiff

credibly testified that the source code to the Soft Way Program was stored in the Debtor's personal computer—a statement that was corroborated by the Debtor's own testimony. [Tape Recording, Feb. 16, 2017 Hearing at 10:09:38–10:11:58 A.M.]; [Tape Recording, Feb 22, 2017 Hearing at 1:24:17–1:24:29 P.M.]. And, while the Plaintiff credibly testified that she was locked out of the Debtor's personal computer, the Debtor did not testify to the contrary; indeed, it is common (or, rather, expected) that a specific username and password is required to access one's computer. Thus, the Debtor's suggestion that the Plaintiff had any access to the source code to the Soft Way Program—which was stored in his personal computer—is unavailing. Knowing that the source code is necessary to make changes to, and also sell, the Soft Way Program, the Court finds that that the Debtor deliberately withheld the source code from the Plaintiff, and his doing so reflects not only a subjective motive to cause the Plaintiff harm (by preventing her from accessing, updating, and selling the Soft Way Program), but also an objective substantial certainty that his withholding the source code would cause injury to the Plaintiff (because she, as an owner of a computer program, could not access, update, and sell the Soft Way Program).

Further, the Debtor admitted that during the time period that he refused to provide the source code to the Plaintiff, he himself sold discs of the Soft Way Program for approximately $300.00 per disc under his *dba* (i.e., Bummel Software) without the Plaintiff's knowledge or approval. [Finding of Fact No. 15]. Indeed, the Plaintiff was completely unaware of the existence of the Debtor's *dba* and received no share of the proceeds from the sales.[8] [*Id.*]. By way of comparison, the case of *In re Grisham*, among others, is similar to the matter at bar. 245 B.R. 65 (Bankr. N.D. Tex. 2000).

---

[8] The Court notes that in late 2002 or early 2003, the Debtor began selling the Soft Way Program on computer discs for approximately $200.00 per disc. [Finding of Fact No. 7]. The Debtor did, in fact, deposit the proceeds from these sales into the Plaintiff's account. [*Id.*]. Hence, the Debtor did not deprive her of these funds. However, after the Debtor surreptitiously set up his *dba* (i.e., Bummel Software) in 2012, he began selling the discs at $300.00 per disc, and he kept all of these proceeds for himself. [Finding of Fact No. 15].

In *Grisham*, the debtors executed a promissory note with the plaintiff bank, whereby the debtors borrowed substantial funds to operate their cattle business and pledged their cattle and equipment to the bank as security. *Id.* at 69. When the bank subsequently declined to renew the loan, the debtors sold the cattle that was previously pledged to the bank as collateral. *Id.* The bank commenced litigation in state court and obtained a judgment for $785,045.50 against the debtors. *Id.* The debtors then filed their bankruptcy petition and the bank initiated an adversary proceeding shortly thereafter seeking an order declaring the $785,045.50 as non-dischargeable. *Id.* at 69–70. The bankruptcy court held that the debtors "sold at least $647,000.00 worth of the bank's collateral in 1997 while using $269,730.00 for interest on the loan and operating expenses." *Id.* at 73. The bankruptcy court also found that the debtors "did not use the proceeds [from the sale of the bank's collateral] other than the $269,730.00 to service the loan or for operating expenses or to replenish the collateral or to reduce the principal of the loan, and yet they lacked the bank's consent for its use." *Id.* at 74. Thus, with regard to those funds not used to pay down the loan or replenish collateral, the bankruptcy court determined that the debtors deliberately and intentionally injured the bank when it converted the bank's collateral; and therefore the court declared as non-dischargeable the amount of $515,315.50 (i.e., $785,045.50 less the $269,730.00) under § 523(a)(6). *Id.*

Like *Grisham*, the Debtor in this suit converted the Plaintiff's property (i.e., the Soft Way Program) by surreptitiously selling the program—which she solely owned—under his personal *dba* without the Plaintiff's consent or knowledge. And like the debtors in *Grisham*, the Debtor here kept all of the proceeds from the sales to himself without notifying the Plaintiff of the sales (or of the disposition of the proceeds from the sales) and without using the proceeds to operate the Plaintiff's business. What happened here is really not much different than what happens in a

standard garden variety "out of trust" sale by a debtor of a vehicle that secures a car loan: when the debtor sells the car and spends the proceeds himself rather than turning over the proceeds to the vehicle lienholder, the Debtor has committed willful and malicious injury to the lienholder's interests. *See, e.g., Ford Motor Credit Co., LLC v. Franceschini (In re Franceschini)*, 2012 Bankr. LEXIS 156 (Bankr. S.D. Tex. Jan. 12, 2012); *see also Theroux v. HSA Mortgage Co. (In re Theroux)*, No. 94-50530, 1995 WL 103342, at *4 (5th Cir. Feb. 27, 1995) (finding that a mobile home dealer acted willfully and maliciously in withholding proceeds from secured lender when there was no evidence that he had an objectively reasonable belief that the money was not owed to the secured lender).

Just as the debtors in *Grisham*, *Franceschini*, and *Theroux* willfully and maliciously injured the lienholders by failing to remit the sale proceeds to them, so has the Debtor here willfully and maliciously injured the Plaintiff.   Indeed, there is no doubt that the Debtor had subjective motive that his actions would cause harm to the Plaintiff as a result of his withholding the source code and his selling the Soft Way Program under his *dba*, Bummel Software.  While he was undertaking these actions, he knew full well that the Plaintiff was unaware of Bummel Software and that he was depriving her of her rightful ownership of the proceeds from the sales of the Soft Way Program.  He also knew that pursuant to the Work Agreement, he had no ownership interest in the Soft Way Program, the source code, and the proprietorship known as Cottage Music Academy, and that the Plaintiff was the sole owner of these assets. *See In re Luby*, 438 B.R. 817, 842 (Bankr. E.D. Pa. 2010) (finding the debtor's conversion of intellectual property belonging to former employer constitutes willful and malicious injury and therefore non-dischargeable under § 523(a)(6)); *In re Wood*, 309 B.R. 745, 754–55 (Bankr. W.D. Tenn. 2004) (finding that the debtor's intention to deprive patent-holder of profits from sale of its

patented seed constituted willful and malicious injury). This Court also finds that there was an objective substantial certainty that the Debtor's withholding the source code and selling the Soft Way Program under his *dba* would cause injury to the Plaintiff (by preventing her from accessing, updating, and selling the program herself and from receiving her rightful share of the proceeds from the sales made under her sole proprietorship, i.e., Cottage Music Academy).

### 2. The Debtor's Arguments are Unavailing

At trial, the Debtor suggested that his conduct—i.e., selling the Soft Way Program that resulted in a $1,400.00 profit (which represents the lost profits awarded to the Plaintiff in the Judgment)—was based on his belief that he owned (or, at least, co-owned) the Soft Way Program. There are several problems with this defense.

### a. *The Debtor is judicially estopped from taking the position that he has ever had any ownership interest in the Soft Way Program*

Judicial estoppel should apply when the following elements are present: "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently." *Reed v. City of Arlington*, 650 F.3d 571, 574 (5th Cir. 2011). In the divorce proceeding in Massachusetts, the Debtor asserted a specific position in the Financial Statement that he signed under oath and submitted to that family law court: namely, that the only asset he owned was a certain real estate property. [Finding of Fact No. 8]. Indeed, in the section of the Financial Statement entitled "Other (such as – stocks, bonds, collections)", the Debtor did not list any "other" assets that he owned at that time. [*Id.*]. In fact, nowhere in the Financial Statement did the Debtor list any interest—existing or prospective—that he had in any trademarks or patents associated with the Soft Way Program. [*Id.*]. Nor did the Debtor even mention the Soft

Way Program itself in the Financial Statement.  The family law court accepted this position in approving the separation agreement and entering the Divorce Agreement.  [*Id.*].

Now, however, the Debtor asserts that he believed all along that he was a joint owner of the Patent and the Soft Way Program and therefore he had the right to sell the Soft Way Program.  The Court finds that the Debtor is judicially estopped from taking this position, as the Debtor did not act inadvertently in the family law court.  The Financial Statement was a five-page detailed document that required the Debtor to answer specific questions and that he signed under penalty of perjury.  His failure to disclose to the family law court that he had an ownership interest in the Patent and the Soft Way Program was not inadvertent, as he did not want that court to require him to compensate his wife at that time (soon to be his ex-wife) for any benefits that he might receive in the future from the Patent, trademark, and/or the Soft Way Program.  Indeed, his subsequent, surreptitious establishment of his own *dba* (Bummel Software) and pocketing all of the sale proceeds himself underscore that his failure to disclose these assets to the family law court was not inadvertent.  Rather, the Debtor has deliberately played a shell game with the family law court and this Court.  His deceitful tactics will not work.  He is judicially estopped from taking the position in this Court that he has had all along an ownership interest in the Patent and the Soft Way Program. *See Hall v. GE Plastic Pacific PTE Ltd.*, 327 F.3d 391, 400 (5th Cir. 2003) ("Because Hall's current position is clearly inconsistent with his previous position which he successfully asserted in the previous suit . . . the district court did not err in finding him judicially estopped.  Moreover, it was within the court's discretion to utilize judicial estoppel and prevent Hall from playing 'fast and loose' with the court by 'changing positions based upon the exigencies of the moment.'").  And, because he is estopped from taking

this position, he cannot overcome the Plaintiff's showing that he willfully and maliciously injured her business.

### b. *The Debtor's alleged reliance on advice from his attorney does not hold up*

Even if the doctrine of judicial estoppel is inapplicable to the Debtor, his asserted defenses do not hold up. At trial, the Debtor testified that his state court attorney advised him that he had the right to sell the Soft Way Program. [Tape Recording, Feb. 22, 2017 Hearing at 1:20:40–1:23:06 P.M.]. This testimony does not help the Debtor. First, this Court does not believe his testimony on this point, and gives it no weight. It strains credulity to believe that the Debtor's state court attorney, who was assuredly aware of and had read the Work Agreement—because it was the key document that the Plaintiff was trying to enforce in the State Court Lawsuit—would have told his client that he was free to sell the Soft Way Program because he was a co-owner. The Work Agreement's very language unequivocally shows that the Debtor had waived any ownership interest in the Soft Way Program. No reasonable attorney litigating whether such a waiver was enforceable would counsel his client to act as if the waiver was unenforceable. Rather, a reasonable attorney would have counseled him to wait until the trial over this issue was completed.

Second, even if the Debtor's attorney did counsel him as he testified, a debtor's defense that he relied on his attorney's advice is only available where the debtor's reliance was reasonable and in good faith. *In re Dreyer*, 127 B.R. 587, 597 (Bankr. N.D. Tex. 1991) (citing *In re Weber*, 99 B.R. 1001, 1018 (Bankr. D. Utah 1989)). Here, the Debtor's argument of reliance on his state court attorney's advice lacks evidence of good faith. The Debtor signed the Work Agreement, and this agreement expressly set forth that the Debtor "waives any interest in the ownership of the work product, including but not limited to copyrightable works, ideas,

discoveries, inventions, patents, products or other information, developed in whole or in part as a result of this agreement and such work product is the exclusive ownership of [Cottage] 'Music Academy.'" [Finding of Fact No. 4]. The Work Agreement also set forth that the Debtor "will not at any time or in any matter, either directly or indirectly . . . divulge, disclose, or communicate in any manner any information that is proprietary to [Cottage] Music Academy." [*Id.*]. The Court finds that the Debtor's testimony that he relied on his counsel's advice is simply not credible and that the Debtor was not innocently relying upon this advice. To the contrary, the Debtor was violating the material terms of the Work Agreement. He knew exactly what he was doing when he refused to give the source code to the Plaintiff and proceeded to sell discs of the Soft Way Program under his personal *dba*; and he also knew that the consequences of his actions were substantially certain to result in harm to the Plaintiff (i.e., the Plaintiff being deprived of her rightful share of the sale proceeds and being unable to access, update, and sell the Soft Way Program). [Finding of Fact Nos. 4 & 15]. Thus, the Debtor's deliberate selling and taking the proceeds from the surreptitious sales under his *dba* also defeats a defense of good faith reliance on his state court attorney's alleged advice.

   c. *The Debtor's personal relationship with the Plaintiff does not relieve him from the terms of the Work Agreement*

   The Debtor also contends that he believed he was all along a joint owner of the Patent and the Soft Way Program—and therefore had the right to sell the Soft Way Program—due to his personal relationship with the Plaintiff. [Adv. Doc. No. 72, p. 4 of 10]. Specifically, the Debtor argues that it was reasonable for him to believe that the Plaintiff permitted him to be a joint owner of the Patent because they "were in a personal relationship at the time" and "[t]hey also had already acted for a long time as if the contract did not exist." [*Id.*]. Essentially, the Debtor attempts to convince this Court that there really was no agreement with the Plaintiff for

him to comply with at all and/or that the Work Agreement became ineffective over the course of their personal/business relationship. This Court is not persuaded by this argument.

First, the Debtor acknowledged that both the Plaintiff and he signed the Work Agreement, [Tape Recording, Oct. 3, 2017 Hearing at 2:17:20–2:20:10 P.M.]—a contract in which he "waive[d] any interest in the ownership of the work product . . . . ," [Finding of Fact No. 4]. Second, the mere existence of a "personal relationship" between the Plaintiff and the Debtor does not automatically extinguish an agreement that was validly executed. Indeed, many contracts and agreements are in fact between individuals that have a personal relationship with one another. Third, the Debtor's argument that "he had not ever seen the Work [Agreement] . . . since the day he executed it with [the Plaintiff]" similarly fails, as the validity of an agreement is not dependent on whether one regularly or periodically sees or discusses such agreement.

Fourth, the Debtor suggests that the Work Agreement became ineffective due to the parties' "prior course of dealing." [Adv. Doc. No. 72, p. 4 of 10]. The Debtor cites *Grisham*, which this Court has previously examined, in support of his position. [*Id.*]. However, the Debtor's interpretation of *Grisham* is misplaced. As discussed above, in *Grisham*, the plaintiff bank obtained a judgment against the debtors for an amount of $785,045.50 for the debtors' improper selling of the bank's collateral (i.e., the cattle). 245 B.R. at 69. The court in *Grisham* determined that the amount of $269,730.00 from the sale proceeds was a dischargeable debt because the debtors used this amount for interest on their loans (with the bank) and to pay expenses in their cattle business. *Id.* at 73. The court found that "[b]y paying these expenses, the [debtors] sought to maintain their business, as they had in the prior year." *Id.* Unlike the debtors in *Grisham*, the Debtor's actions here do not conform to the "prior dealings" that he had with the Plaintiff. Specifically, sometime in 2002 or 2003, the Debtor and the Plaintiff, together, sold the

Soft Way Program for $200.00 per disc. [Finding of Fact No. 7]. In doing so, the Debtor deposited all proceeds of these sales into the Plaintiff's account. [*Id.*]. If the Debtor now insists that he was acting as he did during "prior dealings" with the Plaintiff all along, then he would have continued to deposit all sale proceeds into the Plaintiff's account when he sold the discs in 2012 under his undisclosed *dba*, Bummel Software—just as he did in 2002 and 2003. However, he did not do so; rather, he kept all of the proceeds himself. Accordingly, this defense fails.

>   d. *The Plaintiff's move to New York in no way resulted in the Debtor obtaining an ownership interest in the Soft Way Program*

During trial, counsel for the Debtor attempted to show that the Debtor's actions were not willful or malicious by arguing that while the Plaintiff was in New York, she did not assist the Debtor with developing the program and that the Debtor "was doing all the work" with regard to selling and developing the Soft Way Program. [Tape Recording, Oct. 3, 2017 Hearing at 3:00:33–3:02:01 P.M.]. What the Debtor seems to have forgotten is that the Plaintiff hired him to create and develop the Soft Way Program. [*See* Finding of Fact No. 4]. Indeed, the Debtor acknowledged that the Plaintiff "is not [a] technical person" and had no software developing background, [Tape Recording, Oct. 3, 2017 Hearing at 2:26:34–2:26:58 P.M.]; therefore, it makes eminently good sense that she would choose to hire a program developer to create the Soft Way Program and for her to not be involved in the actual development of software. The fact that the Plaintiff moved to New York for over a year in no way resulted in the Debtor acquiring an interest in the Soft Way Program. As a matter of law, the Debtor is way off the mark in asserting this position.

In sum, under the circumstances set forth above, the Court finds that the Plaintiff has met her burden of showing willful and malicious injury to the Debtor's property (i.e., her business) pursuant to § 523(a)(6), and therefore the Judgment is non-dischargeable.

**D. The Plaintiff has Not Met her Burden Under § 523(a)(2)(A) in Demonstrating that the Judgment was Obtained by False Pretenses or a False Representation, but the Plaintiff has Met her Burden of Proving that the Debtor Committed Actual Fraud**

In order to establish an exception to discharge of a debt for "money, property, services, or an extension, renewal, or refinancing of credit," the debt must have been obtained by "false pretenses, a false representation, or actual fraud." § 523(a)(2)(A). This Court will first address the "false representation" prong and "false pretenses" prong, and thereafter address the "actual fraud" prong.

1. False Representation or False Pretenses

The Fifth Circuit has explained that for a debtor's representation to constitute a false representation or false pretenses under § 523(a)(2), it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied on by another party." *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292–93 (5th Cir. 1995) (internal citation and quotation marks omitted); *see also Field v. Mans*, 516 U.S. 59, 73–75 (1995) (holding that section 523(a)(2)(A) requires subjectively justifiable, but not objectively reasonable, reliance); *In re Dang*, 560 B.R. 287, 290 (S.D. Tex. 2016).

Here, the Plaintiff has failed to satisfy all three elements required to demonstrate that the Judgment resulted from the Debtor's false representation or false pretenses. Indeed, the record is devoid of sufficient evidence showing that any false representations were made by the Debtor or that his words or actions constituted false pretenses. Rather, during closing arguments, when asked whether the Plaintiff's claim that the Debtor stole the source code was based solely on § 523(a)(6), counsel for the Plaintiff simply responded with: "No, I do not cast aside a prospect of an . . . [(a)(2)] non-dischargeability . . . and (a)(6). Those are the two that are the remaining two." [Tape Recording, Oct. 3, 2017 Hearing at 4:08:26–4:09:02 P.M.]. Then, when this Court

inquired specifically how the Debtor's conduct falls under § 523(a)(2)(A), counsel for the Plaintiff responded that:

> The Debtor claimed that the patents and trademarks and intellectual property as his own, treated them as his own, and then sold them or disbursed them, made profits on them, withheld it from [the Plaintiff], who was the true owner, by fraudulent means.  He kept the property claiming it as his own and then sold it claiming it as his own.  And we believe that this is a general fraudulent scheme to deprive her of her property.

[*Id.* at 4:09:15–4:10:55 P.M.].  Unfortunately for the Plaintiff, such assertions do not rise to the level needed to satisfy the three elements required for a false representation or false pretenses. Further, even if this Court found that the Debtor made false representations to the Plaintiff by "claiming [the Patent] as his own," the Plaintiff has not provided any evidence demonstrating that she *relied* on any false representations that the Debtor made.  *See In re Oakley*, 503 B.R. 407, 433 (Bankr. E.D. Pa. 2013) ("[W]hen seeking a determination under section 523(a)(2), the plaintiff/creditor bears the burden of proving all the elements of nondischargeability by a preponderance of the evidence.").  In fact, the Debtor made no representations to the Plaintiff; rather, he surreptitiously sold the Soft Way Program on the open market for $300.00 per disc as if he did in fact own the Soft Way Program; and, he refused to give the Plaintiff the necessary information for her to access and update the source code.  While this conduct was improper, it nevertheless does not amount to a false representation or false pretenses.

In sum, the evidence before this Court does not prove that: (1) the Debtor actually made any representations to the Plaintiff or said or did something that constitutes false pretenses; (2) the Debtor knew whatever representations he made to the Plaintiff were false when he made them; or (3) the Plaintiff relied upon whatever representations or pretenses the Debtor may have made.  Thus, the Court finds that the Plaintiff has not proven by a preponderance of the evidence

that the Judgment should be non-dischargeable under either the "false representation" prong or the "false pretenses" prong of § 523(a)(2)(A). *See In re Sulier*, 541 B.R. 867, 884–85 (Bankr. D. Minn. 2015) (finding "that the plaintiff has failed to establish the elements of false pretenses" because "[t]here was no evidence that the defendant knew that the plaintiff did not know about the Sweno Mortgage thereby creating false impression in order to induce him to buy the house"); *In re Sheaffer*, No. 1:16-AP-00143-MDF, 2017 WL 377941, at \*5 (Bankr. M.D. Pa. Jan. 25, 2017) (granting debtors' motion to dismiss the plaintiffs' amended complaint because it lacked allegations of specific facts to support an exception to discharge under § 523(a)(2)(A) and "Plaintiffs have made it difficult to determine whether they have set forth a plausible case of . . . fraudulent misrepresentations . . . .").

 2. <u>Actual Fraud</u>

 Prior to the Supreme Court's decision in *Husky International Electronics, Inc. v. Ritz*, 136 S. Ct. 1581 (2016), the Fifth Circuit held that to maintain non-dischargeability under the "actual fraud" prong of § 523(a)(2)(A):

> [T]he objecting creditor must prove that: (1) the debtor made representations; (2) at the time they were made the debtor knew they were false; (3) the debtor made the representations with the intention and purpose to deceive the creditor; (4) that the creditor relied on such representations; and (5) that the creditor sustained losses as a proximate result of the representations.

*RecoverEdge L.P.*, 44 F.3d at 1293 (internal quotation marks omitted) (citing *Keeling v. Roeder (In re Roeder)*, 61 B.R. 179, 181 (Bankr. W.D. Ky. 1986)). Because *RecoverEdge* requires that a plaintiff prove that the debtor made a misrepresentation, and because this Court has already held that the Debtor here made no representation to the Plaintiff, it would appear that the Plaintiff cannot prove "actual fraud" under § 523(a)(2)(A). *Husky*, however, made a watershed change that relaxes the requirements for proving actual fraud under § 523(a)(2)(A).

Specifically, in *Husky*, the issue was whether the term "actual fraud" under § 523(a)(2)(A) requires a false representation or "whether it encompasses other traditional forms of fraud that can be accomplished without a false representation, such as a fraudulent conveyance of property made to evade payment to creditors." *Id.* at 1585. Reversing the Fifth Circuit's holding that actual fraud requires a misrepresentation, the Supreme Court held that "actual fraud" under § 523(a)(2)(A) "encompasses fraudulent conveyance schemes, *even when those schemes do not involve a false representation*." *Id.* at 1583 (emphasis added). In the Supreme Court's view, "any fraud that involve[es] moral turpitude or intentional wrong" is sufficient to prove "actual fraud" under § 523(a)(2)(A). *Id.* at 1586 (internal quotation marks omitted). Thus, the Supreme Court remanded to the Fifth Circuit to decide "whether [the debtor] owes a debt to Husky under Texas law." *Husky Int'l Elecs., Inc. v. Ritz*, 832 F.3d 560, 562 (5th Cir. 2016). The Fifth Circuit then issued an opinion and remanded the matter to this Court with instructions to examine probative factors known as "badges of fraud" to determine whether the debtor in that suit actually intended to defraud creditors. *In re Ritz*, 567 B.R. 715, 724 (Bankr. S.D. Tex. 2017).

This Court notes that contrary to the facts presented in the suit at bar, *Husky* involved the issue of whether a plaintiff could pierce the corporate veil of a company to impose personal liability on an individual debtor—a debtor who had transferred large sums of money from one company he controlled to other entities he owned or controlled. *Id.* at 743. Stated differently, the debt in *Husky* that was determined to be non-dischargeable was due to the veil-piercing statute under Texas law that provides for individual liability for certain corporate obligations. Here, the Plaintiff does not allege that the Debtor should be held liable based on this veil-

piercing statute or, for that matter, on other any Texas statute; therefore, in this respect, *Husky*'s holding does not carry the day for the Plaintiff.

However, *Husky* still opens the door for the Plaintiff to prevail under § 523(a)(2)(A). *Husky*'s expansion of the definition of "actual fraud" means that the Plaintiff need not show that the Debtor made a false representation. Indeed, as already discussed above, the Debtor has failed to prove that the Debtor made any representation to her, so there is no question that the Plaintiff cannot satisfy all of the *RecoverEdge* elements.[9]  *See In re Wilhite*, No. 16-10632-JDW, 2017 WL 835764, at *5 (Bankr. N.D. Miss. Mar. 1, 2017) ("The *RecoverEdge* elements have not been met because there was no misrepresentation made by the Debtor to induce the Creditor's performance.").   Yet, pursuant to *Husky*, if the Plaintiff can prove that the Debtor's conduct "counts as fraud and [was] done with wrongful intent" or "involve[es] moral turpitude," then she can prevail under the "actual fraud" prong of § 523(a)(2)(A). *Husky*, 136 S. Ct. at 1586, 1590 (internal quotation marks omitted); *In re Korn*, 567 B.R. 280, 302 (Bankr. E.D. Mich. 2017); *In re Zak*, No. 15-10098-JNF, 2017 WL 2982947, at *21 (Bankr. D. Mass. July 12, 2017).

While this Court has been unable to find any bankruptcy court who has defined "moral turpitude" as it relates to a debtor committing actual fraud, other courts have defined "moral turpitude" in the context of either criminal matters or attorney misconduct.  In a case involving attorney misconduct, the Texas Supreme Court defined "moral turpitude" as "anything done *knowingly* contrary to justice, honesty, principle, or good morals." *Matter of Thacker*, 881 S.W.2d 307, 311 (Tex. 1994). In another suit involving attorney misconduct, the Texas Supreme Court held that "moral turpitude is implicated by crimes that involve dishonesty, fraud, deceit,

---

[9] The holding in *Husky* in no way suggests that a plaintiff cannot prevail under § 523(a)(2)(A) by establishing the five elements set forth in *RecoverEdge*, but simply that a plaintiff is *not required* to establish such elements to prove actual fraud. *Matter of Selenberg*, 856 F.3d 393, 398 n.1 (5th Cir. 2017) ("Although a false representation is no longer required, actual fraud can still be proven by showing that the debtor in fact made a false representation.").

misrepresentation, deliberate violence, or that reflect adversely on a lawyer's honesty, trustworthiness, or fitness as a lawyer in other respects." *Matter of Humphreys*, 880 S.W.2d 402, 408 (Tex. 1994) (internal quotation marks omitted).   Yet another Texas court has applied Black's Law Dictionary's definition, which defines "moral turpitude" as "[t]he quality of a crime involving grave infringement of the moral sentiment of the community as distinguished from statutory mala prohibita." *Hardeman v. State*, 868 S.W.2d 404, 405 (Tex. App.—Austin 1993, pet. dism'd) (internal quotation marks omitted) (citing Black's Law Dictionary 1008–09 (6th ed. 1990)).  The Ninth Circuit has described an action involving moral turpitude as one that is "vile, base or depraved and [] violates accepted moral standards." *Ceron v. Holder*, 747 F.3d 773, 779 (9th Cir. 2014).  The Ninth Circuit has also stated that "[o]nly truly unconscionable conduct surpasses the threshold of moral turpitude." *Robles-Urrea v. Holder*, 678 F.3d 702, 708 (9th Cir. 2012).

Given these definitions of moral turpitude, this Court finds that the Debtor's acts that resulted in the Judgment do not rise to the level of appalling conduct that must be proven to surpass the threshold of moral turpitude.   Thus, the remaining question is whether the Debtor's conduct "counts as fraud and [was] done with wrongful intent." *Husky*, 136 S. Ct. at 1586 (internal quotation mark omitted).

Since the Supreme Court issued its opinion in *Husky*, bankruptcy courts—focusing on *Husky*'s holding that "actual fraud" involves "fraud with actual intent" and noting that the Supreme Court expressly stated that "'fraud' connotes deception or trickery generally", *Husky*, 136 S. Ct. at 1586—have treated conduct involving concealment, deceit, or trickery as "actual fraud." For example, in *In re Robinson-Vinegar*, the court stated the following:

> [The] exception to dischargeability [under § 523(a)(2)(A)] addresses deceit or artifice rooted "in a specific intent to mislead, trick, or cheat

> another person or entity," and the intent to deceive may be shown using circumstantial evidence in relation to the totality of a situation. Beyond affirmative misrepresentation, fraud may consist in intentional silence or concealment of a material fact.

561 B.R. 562, 566 (Bankr. N.D. Ga. 2016). In *In re Sinclair*, the court explained that "the actual fraud in a fraudulent conveyance claim is one of concealment and hindrance, with the fraud being the non-disclosure of the truth, not the disclosure of a non-truth." No. 14-91565-E-7, 2017 WL 1684120, at *32 (Bankr. E.D. Cal. May 2, 2017) (citing *Husky*, 136 S. Ct. at 1586). Also, the court in *In re Loomis* stated that "[a]ctual fraud includes any deceit, artifice, trick or design involving a direct and active operation of the mind, used to circumvent and cheat another . . . ." 558 B.R. 214, 221 (Bankr. S.D. Ohio 2016) (internal quotation marks and citation omitted).

Relying on *Husky*, counsel for the Plaintiff maintains that "there is a general fraudulent scheme under the *Husky* decision." [Tape Recording, Oct. 3, 2017 Hearing at 4:09:30–4:09:39 P.M.]. Specifically, to reiterate counsel's argument, he explained that:

> The Debtor claimed the patents and trademarks and the intellectual property as his own. He treated them as his own, and then sold them or disbursed them, made profits on them, withheld it from [the Plaintiff] . . . by fraudulent means. He kept the property claiming it as his own and then sold it claiming it as his own. We believe that this is a general fraudulent scheme to deprive her of her property.

[*Id.* at 4:10:15–4:10:55 P.M.]. Having heard the testimony of the parties and having reviewed the exhibits admitted into the record, the Court finds that while the Debtor's conduct does not rise to the level of "moral turpitude," his actions nevertheless constitute actual fraud pursuant to the "fraud with wrongful intent" definition. Specifically, the evidence before this Court shows that the Debtor deliberately denied the Plaintiff the source code of the Soft Way Program—thereby preventing her from accessing, updating, and selling the program to potential buyers and requiring her to pay a substantial amount of money to a team of professional programmers to

retrieve such source code. [Finding of Fact Nos. 12, 13, & 14]. And, the Debtor withheld such information despite the Work Agreement requiring him to return "all records, notes, documentation and other items that were used, created, or controlled by [Cottage] Music Academy . . . ." [Finding of Fact No. 4].

Further, the evidence reveals that while the Debtor was intentionally denying the Plaintiff access to the source code, he was deliberately concealing from the Plaintiff the sales of the Soft Way Program that he was making under his personal *dba* (i.e., Bummel Software)— actions that he does not dispute and, in fact, admitted. [Finding of Fact No. 15]. There is no question that the Plaintiff was completely unaware of: (1) the existence of Bummel Software; and (2) the Debtor's selling of the Soft Way Program through this *dba*. [*Id.*]. There is also no question that at the time the Debtor was selling the Soft Way Program for $300.00 per disc under his Bummel Software *dba*, he never disclosed to the Plaintiff the existence of the *dba* or the sales of the discs; meanwhile, the Debtor pocketed all of the proceeds from Bummel Software's sales of the Soft Way Program. [*Id.*]. This conduct unequivocally shows that he intended, through non-disclosure and deceit, to deprive the Plaintiff of the proceeds from the sales of the Soft Way Program. Thus, the Court finds that the Plaintiff has proven by a preponderance of the evidence that the Debtor's conduct falls within the expansive definition of "actual fraud" set forth in *Husky*; the Debtor's conduct involved sufficient concealment and deceit to comprise actual fraud under § 523(a)(2)(A). Indeed, Texas case law supports a conclusion that a cause of action for surreptitious conversion of property—which is exactly what the Debtor did here—constitutes fraud. *See Pena v. First State Bank & Tr. Co.*, 404 S.W.2d 56, 59 (Tex. App.—Corpus Christi 1966) (citing *Port Arthur Rice Milling Co. v. Beaumont Rice Mills*, 143 S.W. 926 (Tex. 1912)).

Moreover, as required under § 523(a)(2), the Plaintiff has shown that the $1,400.00 awarded to her in the Judgment results from the Debtor obtaining money due to his actual fraud (i.e., setting up his *dba* and using this *dba* to secretly sell the Soft Way Program at $300.00 per disc and then pocketing the profits totaling $1,400.00 for himself). [*See* Finding of Fact Nos. 15 & 19]. Stated differently, the Plaintiff has proven that the $1,400.00 was—to use the Supreme Court's phrase from *Husky*—"traceable to" the sales of the discs that the Debtor concealed from the Plaintiff. *See Husky*, 136 S. Ct. at 1589. Thus, because the Plaintiff has shown that the amount of $1,400.00 that the Defendant now owes pursuant to the Judgment was "obtained by" the Debtor's actual fraud, the debt arising from such actual fraud (i.e., the deceitfully-obtained profits of $1,400.00) is excepted from discharge. *In re Beach*, 570 B.R. 300, 333 (Bankr. D. Alaska 2017) ("The Court recognized that [o]nce it is established that specific money or property has been obtained by fraud . . . 'any debt' arising from it is except from discharge.") (internal quotation marks omitted) (citing *Cohen v. de la Cruz*, 523 U.S. 213, 218 (1998)).

The Court similarly finds that the obligation of $16,857.90 imposed on the Debtor by the Judgment is also non-dischargeable under § 523(a)(2)(A). Unlike the $1,400.00, the Debtor did not pocket the $16,857.90. This amount is nevertheless "traceable to" the Debtor's actual fraud (i.e., his refusal to give the Plaintiff the source code that rightfully belonged to her and his establishing Bummel Software and surreptitiously selling the Soft Way Program ). Indeed, there is no question that the Debtor's actual fraud forced the Plaintiff to spend $16,857.90 to hire professional programmers to retrieve the source code and create an executable file. [Finding of Fact Nos. 12, 13, & 14]. This $16,857.90, together with the $1,400.00, amounts to the "debt" that was imposed upon the Debtor by the Judgment—a debt that arose from the Debtor's actual fraud. Indeed, had the Debtor not committed the above-described actual fraud, the amount of

40

$16,857.90 (in addition to the $1,400.00) would never have been a debt awarded to the Plaintiff and owed by the Debtor. *See In re Beach*, 570 B.R. at 333 ("[B]ecause the underlying debt arose from actual fraud, not only the amounts fraudulent[ly] obtained, but also the treble damages, attorney fees, and costs awarded were also nondischargeable under § 523(a)(2).").

In sum, the Court finds that the Plaintiff has met her burden in establishing that the Judgment is non-dischargeable under both §§ 523(a)(2)(A) and (a)(6). Therefore, this Court grants the Plaintiff's request that the Debtor's actual damages described in the Judgment be declared as non-dischargeable. Specifically, there are two amounts referenced in the Judgment that comprise the Plaintiff's actual damages and are non-dischargeable obligations. These amounts are: (1) the $1,400.00 of ill-begotten profits that the Debtor generated from Bummel Software's sale of discs ($300.00 per disc) of the Soft Way Program, [*see* Finding of Fact No. 19]; and (2) the Plaintiff's costs of $16,857.90 to develop replacement software when the Debtor intentionally refused to provide her with the source code, [*see id.*].

### E. The Attorney's Fees Awarded in the Judgment are also Non-Dischargeable

As set forth immediately above, the Judgment awarded the Plaintiff actual damages of $18,257.90 (i.e., $1,400.00 plus $16,857.90), [Finding of Fact No. 19]; and based upon the discussion above, this amount is non-dischargeable. The Judgment also awarded the Plaintiff $46,650.00 in attorney's fees for the prosecution of the State Court Lawsuit, as well as $15,000.00 for any appeal that was taken, [*id.*]; and here, the Debtor did appeal— unsuccessfully—to the court of appeals, [Finding of Fact No. 21]. Case law has established that these attorney's fees are also non-dischargeable.

In *Cohen*, the Supreme Court held that with respect to a § 523(a)(2)(A) action, when a plaintiff has successfully proven that the actual damages awarded by a state court judgment are

non-dischargeable, the amount that becomes non-dischargeable encompasses both the actual damage amounts in the judgment, plus the attorney's fees awarded in the judgment. 523 U.S. at 219, 223. In the suit at bar, this Court has held that the Plaintiff has successfully proven that the Judgment is non-dischargeable under § 523(a)(2)(A) because she has shown that the Debtor committed actual fraud. Thus, *Cohen* unquestionably applies. Further, even if the Plaintiff has only proven that the Judgment is non-dischargeable under § 523(a)(6), the attorney's fees awarded in the Judgment are still non-dischargeable. In *Matter of Gober*, the Fifth Circuit stated unequivocally that "[w]hen the primary debt is nondischargeable due to willful and malicious conduct, the attorney's fees and interest accompanying compensatory damages, including post-judgment interest, are likewise nondischargeable." 100 F.3d 1195, 1208 (5th Cir. 1996).

Thus, the attorney's fees of $61,650.00 (i.e., the sum of $46,650.00 plus $15,000.00), as set forth in the Judgment, are also non-dischargeable obligations.

## F. The Plaintiff is Not Entitled to Recover the Attorney's Fees and Costs that she has Incurred for the Prosecution of this Adversary Proceeding

"It is a well-settled rule that a joint pretrial order signed by both parties supersedes all pleadings and governs the issues and evidence to be presented at trial." *McGehee v. Certainteed Corp.*, 101 F.3d 1078, 1080 (5th Cir. 1996). Here, although the Plaintiff requested her attorney's fees in the Complaint for the prosecution of this adversary proceeding, [Finding of Fact No. 24], the Plaintiff's pretrial statement contains no request for attorney's fees, [Finding of Fact No. 26]. Under these circumstances, the Court finds that the Plaintiff has waived any right she may have had to attorney's fees.

Fifth Circuit case law supports this ruling. In *Elvis Presley Enterprises, Inc. v. Capece*, 141 F.3d 188 (5th Cir. 1998), the plaintiff appealed the district court's denial of its attorney's fees. The Fifth Circuit affirmed this ruling by stating that the plaintiff had waived its claim for

such fees because the joint pretrial statement never requested the fees under the applicable statute. *Id.* at 206. The facts at bar are very similar to those in *Capece*, and, accordingly, the Plaintiff is not entitled to recover her attorney's fees for prosecuting this adversary proceeding.

Alternatively, even if the Plaintiff had requested her attorney's fees in the pretrial statement, under the "American Rule", each party pays his/her own attorney's fees unless a statute or contract—a so-called "fee shifting" provision—sets forth otherwise. *In re Kirk*, 525 B.R. 325, 330 (Bankr. W.D. Tex. 2015); *In re Huddleston*, No. 16-31488-SGJ-7, 2017 WL 1207522, at *15 (Bankr. N.D. Tex. Mar. 31, 2017). Here, there is no statute that allows the Plaintiff to recover her attorney's fees; indeed, the Code does not provide for such relief. Moreover, the only contract involved in this suit is the Work Agreement, [Finding of Fact No. 4], and it contains no provision allowing the Plaintiff to recover her attorney's fees, [*see* Pl's Ex. No. 2]. Accordingly, the Plaintiff cannot recover the attorney's fees that she has incurred for the successful prosecution of this adversary proceeding.

### G. The Plaintiff is Entitled to Pre- and Post-Judgment Interest, and this Interest is Non-Dischargeable

As with attorney's fees, the Plaintiff did not request either pre- or post-judgment interest in her pretrial statement. [Finding of Fact No. 26].[10] Under these circumstances, one would think that the Plaintiff is not entitled to any interest based upon the rule articulated by the Fifth Circuit in *Capece* that a joint pretrial order supersedes all pleadings, and that failure to assert a claim in the joint pretrial statement waives that particular claim. However, there is an exception to this rule with respect to pre-judgment and post-judgment interest.

In *Meaux Surface Protection, Inc. v. Fogleman*, the plaintiff requested pre- and post-judgment interest in its original complaint, but did not reassert these requests in the pretrial

---

[10] Indeed, she did not even request pre- or post-judgment interest in the Complaint. [Finding of Fact No. 24].

order.  607 F.3d 161, 172 (5th Cir. 2010).  The district court denied the request for such interest.
*Id.*  On appeal, the defendants argued that the ruling was correct on the grounds that the plaintiff
had waived any rights to interest due to its failure to request such relief in the pretrial order.  *Id.*
Indeed, the defendants relied upon the Fifth Circuit's language in *Capece* that "[i]f a claim or
issue is omitted from the [pretrial] order, it is waived, even if it appeared in the complaint."  *Id.*
(citing *Lindy Investments v. Shakertown Corp.*, 209 F.3d 802, 804 n.1 (5th Cir. 2000) (quoting
*Capece*, 141 F.3d at 206)).  And, in fact, in issuing its opinion in *Fogleman*, the Fifth Circuit
conceded that the "Defendants' waiver argument is not entirely without support."  *Id.*
Nevertheless, the Fifth Circuit rejected this waiver argument.

It did so in two respects.  First, with respect to post-judgment interest, the Fifth Circuit,
citing 28 U.S.C. § 1961(a), articulated an ironclad rule that "[p]ost-judgment interest is awarded
as a matter of course."  *Id.* at 173.  Indeed, the Fifth Circuit held that "[t]he matter is not
discretionary. . . .  Moreover, failure to brief the matter is treated as oversight, not waiver."  *Id.*
(internal quotation marks and citation omitted).  Stated differently, the Fifth Circuit held that
even though the plaintiff failed to request post-judgment interest in the pretrial statement, it did
not waive the right to such interest and, in fact, was entitled to this interest pursuant to the
statute.  Application of this rule at the proceeding at bar leads this Court to conclude that even
though the Plaintiff did not plead for post-judgment interest in her pretrial statement, she is
nevertheless entitled to such interest, which will begin to accrue at the federal judgment interest

rate on the date of the entry of this Court's order declaring the Judgment to be non-dischargeable.[11]

With respect to pre-judgment interest,[12] the Fifth Circuit's decision in *Fogleman* also provides an exception to the general rule that a claim is waived if not requested in the joint pretrial statement. Specifically, the Fifth Circuit stated that:

> "State law governs the award of prejudgment interest in diversity cases." *Harris v. Mickel*, 15 F.3d 428, 429 (5th Cir. 1994) (citations omitted). "In the absence of a statutory right to prejudgment interest, Texas law allows for an award of equitable prejudgment interest under *Cavnar v. Quality Control Parking, Inc.*, 696 S.W.2d 549 (Tex. 1985)." *Bituminous Cas. Corp. v. Vacuum Tanks, Inc.*, 75 F.3d 1048, 1057 (5th Cir. 1996). Under this standard, "an equitable award of prejudgment interest should be granted to a prevailing plaintiff in all but exceptional circumstances." *Id.* (citation omitted).

*Id.* at 172. Thus, with respect to diversity cases, the Fifth Circuit set forth that pre-judgment interest should be granted in all but exceptional circumstances. Admittedly, the adversary proceeding at bar is not a diversity suit; nevertheless, other Fifth Circuit cases support a conclusion that the Plaintiff here is entitled to pre-judgment interest despite her failure to include such a request in her pretrial statement. In *Consol. Cigar Co. v. Texas Commerce Bank*, the Fifth Circuit stated that "[f]ederal courts have recognized that while the substantive questions of entitlement to interest and the rates of interest are to be resolved by the applicable state law, the

---

[11] For purposes of clarity, the phrase "post-judgment interest" does *not* refer to the interest that has been accruing on the Judgment at the rate of 5.0% per annum, which was the rate that the state court determined when it entered the Judgment on February 23, 2013 in the State Court Lawsuit. Rather, this phrase refers solely to the interest that will accrue at the federal judgment interest rate beginning on the date of the entry of this Court's order declaring the Judgment to be non-dischargeable. Thus, the interest rate of 5.0% per annum will be replaced by the federal judgment interest rate. *In re Guinn*, No. ADV 13-90232-CL, 2014 WL 4426125, at *8 (Bankr. S.D. Ca. Aug. 21, 2014) (holding that the interest rate set forth in the state court judgment is only effective up to the date of the bankruptcy court's entry of its judgment of non-dischargeability, and that thereafter the rate will be the federal post-judgment interest rate pursuant to 28 U.S.C. § 1961); *In re Cottle*, 2016 Bankr. LEXIS 3751, at *14–15 (B.A.P. 9th Cir. Sept. 23, 2016) (same).

[12] For purposes of clarity, the phrase "pre-judgment interest" refers to all of the interest that has been accruing at 5.0% per annum under the Judgment up to the date of the entry of this Court's order declaring the Judgment to be non-dischargeable.

adequacy of a plaintiff's pleadings must be resolved by reference to Fed. R. Civ. P. 54(c) and cases construing it." 749 F.2d 1169, 1174 (5th Cir. 1985) (citations omitted). The Fifth Circuit then noted that "under the Federal Rules . . . there is no requirement for a specific pleading for prejudgment interest." *Id.* at 1175. Indeed, according to the Fifth Circuit: "Under Texas law, prevailing parties receive prejudgment interest as a matter of course," *Executone Info. Sys., Inc. v. Davis*, 26 F.3d 1314, 1329 (5th Cir. 1994), and "[t]he award of prejudgment interest is based on the equitable grounds that an injured party should be made whole," *id.* at 1330 (internal quotation marks omitted). This is so even if the party who is receiving such interest has been accorded only a part of the relief that it has requested. *Id.*

Here, the state court awarded interest to the Plaintiff in the Judgment at 5.0% per annum. [Finding of Fact No. 19]. Under these circumstances, this Court does not discern any "exceptional circumstances" under the *Fogleman* holding to deny pre-judgment interest (accruing at 5.0% per annum) even though the Plaintiff failed to expressly request such relief in her pretrial statement. The Court also notes that the Fifth Circuit has expressly stated that "[t]he Texas Supreme Court has made clear that the award of prejudgment interest, although equitable in nature, is not generally a matter for the trial court's discretion." *Davis*, 26 F.3d at 1330 (citing *Matthews v. DeSoto*, 721 S.W.2d 286, 287 (Tex. 1986)). These comments, plus holdings from Texas courts awarding pre-judgment interest for successful prosecution of fraud claims[13]—i.e., tortious claims that are similar to the tortious claims by the Plaintiff in the suit at bar[14]—

---

[13] *See, e.g., Robertson v. ADJ P'ship, Ltd.*, 204 S.W.3d 484, 496 (Tex. App.—Beaumont 2006, pet. denied); *Voskamp v. Arnoldy*, 749 S.W.2d 113, 124 (Tex. App.—Houston [1st Dist.] 1987, writ den'd).

[14] Claims brought under §§ 523(a)(2) and (a)(6) are tort claims. *See, e.g., In re Mendiola*, 99 B.R. 864, 866 (Bankr. N.D. Ill. 1989) ("There are three other general categories of debt that are not discharged according to Section 523(a), which require some special attention. These are a variety of intentional tort claims, described in subsections (2), (4) and (6) of Section 523(a)."); *In re Baillio*, No. 7-08-12171 JA, 2010 WL 3782065, at *53 (Bankr. N.M. Sept. 21, 2010).

convince this Court that it must award pre-judgment interest to the Plaintiff. Here, the pre-judgment interest, which has been accruing at 5.0% per annum as set forth in the Judgment, will run from the date that the Plaintiff initiated the pending adversary proceeding—i.e., December 31, 2015—up to the date of the entry of this Court's order declaring the Judgment to be non-dischargeable.[15] *See Crocker Nat. Bank v. Ideco Div. of Dresser Indus., Inc.*, 739 F. Supp. 338, 341 (S.D. Tex. 1990); *Lee v. Lee*, 47 S.W.3d 767, 800 (Tex. App.—Houston [14th Dist.] 2001, pet. denied).

Any interest that accrues—both prior to, and after, the entry of this Court's order declaring the Judgment to be non-dischargeable—is also non-dischargeable pursuant to the Supreme Court's language in *Cohen* that the non-dischargeable debt includes "other relief" that is awarded. 523 U.S. at 223; *Gober*, 100 F.3d at 1208; *In re Ayesh*, 465 B.R. 443, 449–50 (Bankr. S.D. Tex. 2011) (applying *Cohen* to find legal fees, interest, and other costs from the breach of contract to be non-dischargeable); *Miller v. Lewis*, 391 B.R. 380, 385 (E.D. Tex. 2008) (applying *Cohen* and finding that the entirety of a judgment was an "obvious outgrowth" of the "fraudulent scheme").

Thus, the amount of interest that is non-dischargeable as of the date of this Court's order declaring the Judgment to be non-dischargeable (i.e., November 17, 2017) can be calculated as follows. First, the face amount of liability under the Judgment that is non-dischargeable is $79,907.90 (i.e., the sum of $1,400.00 plus $16,857.90 plus $46,650.00 plus $15,000.00). [Finding of Fact No. 19]. Pursuant to the Judgment, as well as the case law cited above, interest has been accruing on this amount at the rate of 5.0% per annum from the date that the Plaintiff

---

[15] Of course, the Plaintiff is also entitled to the interest on the Judgment that was accruing at 5.0% per annum even before the Plaintiff initiated the instant adversary proceeding.

initiated the State Court Lawsuit (which was March 7, 2011)[16] through the date of the entry of this Court's order declaring the Judgment to be a non-dischargeable obligation (which is November 17, 2017). The total of this accrued interest—which is also non-dischargeable—is $26,785.56.[17] Thus, the principal amount on which the federal judgment interest rate will accrue is $106,693.46.[18] Finally, the per diem amount of post-judgment interest that is non-dischargeable will be determined by multiplying the federal judgment interest rate times $106,693.46 times 1/365. As of November 17, 2017, the federal judgment interest rate is 1.52%, which means that the per diem non-dischargeable post-judgment interest as of November 17, 2017 will be 1/365 times 1.52% times $106,693.46—or $4.44.

## V. CONCLUSION

If the Court had adjudicated this suit prior to *Husky*, the Court would have held that the Plaintiff has failed to prove all of the elements of § 523(a)(2)(A) because the Fifth Circuit's *RecoverEdge* holding required that a plaintiff prove that the debtor made a misrepresentation— and here, the Debtor made no misrepresentation to the Plaintiff. However, *Husky* eliminated this requirement with respect to proving "actual fraud" under § 523(a)(2)(A), and held that a plaintiff need only prove an "intentional wrong" by the Debtor. In the suit at bar, this Court finds that the Plaintiff has met her burden in proving that the Judgment resulted from conduct constituting actual fraud by the Debtor; therefore, the amounts owed by the Debtor under the Judgment are non-dischargeable.

---

[16] *See* Finding of Fact No. 13.

[17] The total interest of $26,785.56 is calculated as follows: (2447 days / 365 days) x 5.0% x $79,907.90 = $26,785.56.

[18] The figure of $106,693.46 is the sum of the face amount of the Judgment ($79,907.90), plus the interest that has been accruing at 5.0% per annum ($26,785.56).

Even if this Court is incorrect that the Judgment is non-dischargeable under § 523(a)(2)(A), this Court still finds that the Plaintiff has met her burden in proving that the Judgment is non-dischargeable under § 523(a)(6). Specifically, the Debtor's refusal to give the source code to the Plaintiff, his establishment of Bummel Software, his use of this *dba* to surreptitiously sell the Soft Way Program (owned entirely by the Plaintiff), and his pocketing all of the proceeds for himself constitute willful and malicious injury to the Plaintiff's property (i.e., her business).

Finally, to reiterate this Court's ruling after the Plaintiff rested in her case-in-chief, the Plaintiff has failed to prove that she has suffered any damages arising out of any actions taken by the Debtor after the state court entered the Judgment. [Adv. Doc. No. 52]. Therefore, the only debt that is non-dischargeable is the face amount of Judgment itself plus interest, as there are no other debts owed by the Debtor to the Plaintiff that arose after the state court entered the Judgment.

An order consistent with these Findings of Fact and Conclusions of Law will be simultaneously entered on the docket.


Signed on this 17th day of November, 2017.

Jeff Bohm
United States Bankruptcy Judge